**STIEFEL FEED COMPANY, Plaintiff,**

v.

**AEROVENT FAN COMPANY,**
Defendant.

**Civ. No. 1670.**

United States District Court
S. D. Ohio, W. D., at Dayton.
March 30, 1956.

Rothberg, Callmeyer & Doermer, Fort Wayne, Ind., Wasserman & Talbot, Dayton, Ohio, for plaintiff.

Hugh H. Altick, Dayton, Ohio, Robert S. Miller, Troy, Ohio, for defendant.

CECIL, District Judge.

In the early Spring of 1952, and for some time prior thereto, Harold Brown was employed by the Mid-West Grain Company of Fort Wayne, Indiana. At that time this company was producing a feed with a corn-oil-meal and blackstrap molasses content.

In April, 1952, the Mid-West company went into bankruptcy and Mr. Brown was out of employment. He had been in the elevator and feed business for a number of years and had developed an interest in producing a feed made of approximately 60% blackstrap molasses and 40% corn-oil-meal. Mr. Brown had particularly in mind a feed known as Oma-Las, manufactured by Vilactos Laboratories of Des Moines, Iowa. This feed was light and fluffy and had a pleasant aroma. Mr. Brown desired to duplicate this as nearly as possible.

In May of 1952, he met Mr. Joseph L. Stiefel. Mr. Stiefel operated an elevator under the name of Stiefel Grain Company of Syracuse, Incorporated. Mr. Brown interested Mr. Stiefel in his project and they entered into an agreement to manufacture a corn-oil-meal and blackstrap molasses feed as nearly like Oma-Las as possible. They first contacted a Mr. Robert Reese of the Indiana Grain and Machinery Company, with reference to equipment required for their project. It was recognized that a dryer or dehydrating machine would be necessary and Mr. Reese, not having such equipment, Mr. Joseph Shape, of the Sidney Grain Machinery Company, was next contacted. This first contact was made at Syracuse. Subsequent to this, Mr. Brown and Mr. Stiefel went to Sidney and met Mr. Shape. Mr. Shape introduced them to Mr. Carl Slagetter, Plant Superintendent of Sidney Grain Machinery Company.

They discussed their problem with Mr. Slagetter and he advised them that Mr. Chester Culp, of Aerovent Fan Company in Piqua, knew a great deal about dryers and dehydrating machines. This was June 6, 1952. On the afternoon of that day, Mr. Slagetter, Mr. Shape, Mr. Brown and Mr. Stiefel went to Piqua to see Mr. Culp. They entered the Engineering Building of the Aerovent Fan Company and Mr. Slagetter introduced the other men to Mr. Culp.

The problem was discussed with Mr. Culp and he stated that he was not familiar with the drying of molasses. Mr. Brown said "Well, that is nothing to be alarmed about, we don't either." Mr. Culp told about drying broom straws at a plant in Springfield, Ohio, and drying grains and hay. (R. p. 440.) On this occasion Mr. Culp explained to the men present a machine known as "Star Drier" which he had invented. He showed them this machine and demonstrated its operation. It was agreed here that Mr. Culp would pick up Mr. Shape in Sidney the next day, June 7, and go to Syracuse, Indiana, to look over the elevator of Stiefel Grain Company. This was done and Mr. Culp made measurements and figured out approximate locations of the different

pieces of equipment. He agreed to draw and submit some plans for the installation. This was later done.

In the discussions either at Piqua on June 6, or at Syracuse on June 7, a question arose as to insurance. As a result of this discussion, Mr. Culp, Mr. Brown and Mr. Stiefel went to Chicago on June 19 to see a representative of the insurance company. They had a conference on June 20, with Mr. Parks, a representative of the insurance company and an arrangement was worked out whereby the dryer could be installed in the basement of the elevator. While consulting with the insurance company, they were met by Mr. Knowland Mitchell, Sales Manager of Aerovent Fan & Equipment, Inc., of Lansing, Mich. They later took Mr. Mitchell to the airport from whence he returned to Lansing. Following this, Mr. Shape contacted Paul L. Myers, a millwright, who was employed to make the installation in the elevator.

On June 26, Mr. Brown, Mr. Stiefel, Mr. Myers and Joseph Hunt went to Piqua and again saw Mr. Culp. The record is not clear as to just where or how the dryer was ordered. Mr. Stiefel indicates (R. p. 193) that it was purchased on the night of June 26, at Piqua. On this occasion Mr. Culp was met at the hotel after factory closing hours and he went with the other men to the factory, opened it up and let them in. Mr. Stiefel says (R. p. 193) "As I see it, the fan was ordered that night for delivery as soon as we were ready to install it." It seems that the purchase of the dryer was more or less implied from the beginning of the negotiations and that there never was a written purchase order given or a definite contract, either oral or written, made.

The installation by Mr. Myers and his crew was begun about the end of June and completed on or before August 24. During the progress of this installation, Mr. Culp wrote to Minneapolis-Honeywell Company to arrange for thermostatic controls in accordance with the requirements of the insurance company. These controls involved complicated wiring and during the installation, Mr. Culp sent Marion Free to Syracuse to supervise the installation of the wiring. On August 15, Mr. Culp, and Mr. Free left Piqua with the "Star Drier" in question. It was delivered at Syracuse on August 16, and Mr. Culp and Mr. Free assisted in placing it in the basement where it was to be installed. The plant was put in operation on August 24 and utterly failed to produce the desired results. The day following the unsuccessful operation of the plant, Mr. Culp went to Syracuse and following this, he met Mr. Stiefel in Sidney on August 27.

When Mr. Brown and Mr. Stiefel met Mr. Culp on June 6, they informed him that they were planning to form a corporation to be called "Stiefel Feed Company, Inc.," for the purpose of manufacturing a feed product. The articles of incorporation for this company were issued July 8, 1952. The Directors' meeting and election of officers was July 24, 1952.

The only written indication of sale is an invoice of Aerovent Fan & Equipment, Inc., of Lansing, Michigan, dated September 19, 1952. This invoice has been offered in evidence as plaintiff's Exhibit 9. It is directed to "Stiefel Grain Company, Syracuse, Indiana," and shows the order date as August 4; the date shipped, August 15, August 29 and September 19. Under the heading: "Salesman" are listed Stewart Supply Co., George Rolfes and Chester Culp. Under the heading "Shipped Via" is "Delivery by Culp, Expressways' Inc., and Railway Express." The amount of the invoice is $2,200.03, and it is admitted that it has never been paid.

The plaintiff, Stiefel Feed Company, Inc., filed an amended complaint, by which it seeks to recover from Aerovent Fan Company, Inc., defendant, the sum of approximately $49,000 for breach of warranties.

It is claimed by plaintiff that the defendant warranted that the dryer

would not only dry the molasses, but would cause it to come out as a dry, fluffy product like Oma-Las. The defendant claims that Mr. Culp did not in fact make any such warranties and that if he did make them, it was not within the scope of his authority to do so.

It is conceded that none of the parties knew how to produce the desired result. The process by which Oma-Las, the only known product of its kind, was manufactured, was unknown. This process was apparently a well-guarded secret. Mr. Reese offered to work his way into the plant and find out, but this was not permitted by Mr. Brown. The officers and management of the defendant company would undoubtedly have been greatly shocked had they known or realized that their Chief Engineer was conducting negotiations which would commit the company to guarantee the result sought by plaintiff. This was an experiment in which Mr. Culp was trying to be of assistance. He may have been unjustifiably enthusiastic in his hopes.

The plaintiff seeks to hold the defendant on the basis of the acts and conduct of its Chief Engineer, Mr. Culp. The agent cannot bind the company by holding himself out to have power and authority which he does not have. It would be different if the company itself held the agent out to have such power and authority. Here, Mr. Stiefel and Mr. Brown were introduced to Mr. Culp through the Plant Superintendent of the Sidney Grain Machinery Company. They did not enter the defendant company through its executive offices and were not introduced to Mr. Culp through any executive officers of the company. Had they come to the management and stated their problem and then by them been referred to Mr. Culp as a man who might solve it, the company would not be in a position to deny Mr. Culp's authority. As it was, the plaintiff attempts to "lift itself by its own bootstraps."

The Court finds that Mr. Culp was without authority to bind the defendant company to warrant that the dryer would produce the result which plaintiff sought, or which it claims the defendant warranted.

The defendant seeks by counterclaim to recover the cost of the dryer. The plaintiff claims that the defendant cannot affirm the sale and deny the conditions under which it was sold. The Court would agree with this logic.

The Court has read the entire record with a view of attempting to establish just what commitments or statements were made by Mr. Culp. The evidence of what was said at the various conferences in which Mr. Culp, Mr. Brown and Mr. Stiefel were present, is highly conflicting. The Court must conclude from this evidence that the plaintiff has failed to establish by a preponderance of the evidence that Mr. Culp guaranteed a manufacturing process which would produce the result which plaintiff sought to achieve. The plaintiff purchased a dryer which it had installed as part of a manufacturing process.

The plaintiff claims that its transactions with the defendant comes within Subdivision (A), Section 1315.16 of the Ohio Revised Code. This section reads as follows:

"(A) When the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment, whether he is the grower or manufacturer or not, there is an implied warranty that the goods shall be reasonably fit for such purpose."

The Court is of the opinion that the plaintiff cannot go to the defendant, state a result that it hopes to accomplish through a manufacturing process, buy a piece of standard stock equipment made by the defendant and then hold the defendant liable for all damages that flow from the failure of the equip-

ment to function in the manufacturing process as was hoped for by the plaintiff. It cannot be said that the plaintiff relied on the skill and judgment of Mr. Culp when admittedly, no one knew how to achieve the end result. The process was in a highly experimental stage. Mr. Culp said from the outset he knew nothing about drying molasses. He knew he had a potent drier. Mr. Stiefel and Mr. Brown saw it operate and they believed it would accomplish their purpose.

The defendant claims that Subdivision (D) of the above section is applicable. This section reads as follows:

"(D) In the case of a contract to sell or a sale of a specified article under its patent or other trade name, there is no implied warranty as to its fitness for any particular purpose."

In Seitz v. Brewers' Refrigerating Machine Co., 141 U.S. 510, at page 518, 12 S.Ct. 46, at page 48, 35 L.Ed. 837, the rule is stated, as follows:

"The rule invoked is that where a manufacturer contracts to supply an article which he manufactures, to be applied to a particular purpose, so that the buyer necessarily trusts to the judgment of the manufacturer, the law implies a promise or undertaking on his part that the article so manufactured and sold by him for a specific purpose, and to be used in a particular way, is reasonably fit and proper for the purpose for which he professes to make it, and for which it is known to be required; but it is also the rule, as expressed in the text-books and sustained by authority, that where a known, described and definite article is ordered of a manufacturer, although it is stated by the purchaser to be required for a particular purpose, still, if the known, described and definite thing be actually supplied, there is no warranty that it shall answer the particular purpose intended by the buyer."

The rule is also well stated in Davis Calyx Drill Co. v. Mallory, 8 Cir., 137 F. 332. At page 334 of 137 F., it is stated:

"But no implied warranty that a machine, tool or article is suitable to accomplish a particular purpose or to do a specific work arises where the vendor orders of the manufacturer, or purchases of the dealer, a specific, described, or definite machine, tool, or article, although the vendor knows the purpose or work which the purchaser intends to accomplish with it, and assures him that it will effect it. Such an assurance is but the expression of an opinion, when it is followed by a written contract, complete in itself, which is silent upon the subject. The extent of the implied warranty in such a case is that the machine, tool, or article shall correspond with the description or exemplar, and that it shall be suitable to perform the ordinary work which the described machine is made to do."

This case quotes an apt illustration which is enlightening and explanatory, given by Maule, J., in Keates v. Cadogan, 2 Eng.Law & Eq., Rep. 320, 10 C.B. 591. This is as follows:

"If a man says to another, 'Sell me a horse fit to carry me,' and the other sells a horse which it knows to be unfit to ride, he may be liable for the consequences; but if he says, 'Sell me that gray horse to ride,' and the other sells it, knowing that the former will not be able to ride it, that would not make him liable."

The last paragraph of the opinion in Dunbar Bros. Co. v. Consolidated Iron-Steel Mfg. Co., 2 Cir., 23 F.2d 420, is apropos to the case at bar.

"Accepting the facts as found below, and having due regard for the custom of the trade, as the parties must in their ordinary business understanding, we hold there was no implied warranty of suitability of the springs to withstand breakage while used in plaintiff's locks, but rather that the defendant was co-operating in solving the problem of the plaintiff in securing an unbreakable spring in manufacturing its product. For failure to successfully solve this problem no liability may be imposed upon the defendant."

■ The Court is of the opinion that the plaintiff is not entitled to recover, that its amended complaint should be dismissed and judgment rendered in favor of the defendant on said amended complaint.

■ The Court is further of the opinion that the defendant is not entitled to recover on its counterclaim. The defendant is not the proper party in interest to recover for this sale. The dryer was sold by Aerovent Fan & Equipment, Inc., of Lansing, Mich., as heretofore stated. The evidence throughout shows that Aerovent Fan & Equipment, Inc., is a separate and distinct corporation from the defendant. This distinction is affirmed over and over throughout all of the testimony and it is repeatedly stated that the defendant company made no sale, that all sales were made through Aerovent Fan & Equipment, Inc.

The Court considers that the findings of fact and conclusions of law stated herein are sufficient to comply with the requirements of Rule 52, Fed.Rules Civ. Proc. 28 U.S.C.A.

An order of judgment may be drawn in accordance with the rulings herein made.